Adam J. Zapala (SBN 245748)
Kevin J. Boutin (SBN 334965)
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
kboutin@cpmlegal.com

Katrina Carroll (*pro hac vice*)
**CARROLL SHAMBERG LLC**
111 W. Washington Street
Suite 1240
Chicago, IL 60602
Telephone : (872)-215-6205
katrina@csclassactions.com

***Attorneys for Plaintiff and the Putative Class***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSE TORRES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SEATGEEK, INC., a Delaware corporation headquartered in New York; and DOES 1 through 25, inclusive.<br><br>Defendants. | Case No. 3:25-cv-07118-LB<br><br>Hon. Laurel Beeler<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**1. VIOLATION OF THE CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT (CAL. PENAL CODE § 502)**<br>**2. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51)**<br>**3. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 631)**<br>**4. VIOLATION OF ART. 1, § 1 OF THE CALIFORNIA CONSITUTION (INVASION OF PRIVACY)**<br>**5. COMMON LAW INVASION OF PRIVACY (INTRUSION UPON SECLUSION)** |

Plaintiff Jose Torres, individually and on behalf of all other persons similarly situated, by and through Plaintiff's attorneys, makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This class action lawsuit arises from Defendant SeatGeek, Inc.'s ("SeatGeek" or "Defendant") systematic violation of California citizens' privacy rights in collecting consumers' website browsing activities and transmitting that information to third parties. Without obtaining consent or a court order, SeatGeek installs various tracking technologies on its website that function as "pen registers" under California law, secretly capturing and transmitting users' personally identifying information to third parties without authorization and consent. The collected information is not limited to device identifiers. SeatGeek also collects and transmits information to undisclosed third parties concerning specific user website browsing activities who use that information to create extensive profiles on the user and ensure that this data is not anonymous.

2. SeatGeek operates and owns the website SeatGeek.com (the "Website"), a ticket platform that enables users to buy and sell tickets for live sports, concerts, and theater events. When users visit the Website, SeatGeek causes at least three trackers, including, the TikTok Pixel, the Bing Tracker and the Facebook Pixel (collectively, the "Trackers"), to be installed on users' browsers. The Trackers are operated by separate and distinct third parties, respectively: TikTok, Microsoft and Meta (the "Third Parties").

3. Through these Trackers, SeatGeek collects and discloses information such as users' dialing, routing, addressing, and signaling information, including device details (make, model, operating system), browser information, Internet Protocol ("IP") addresses, URLs of pages visited, and other personal information ("Device Metadata") to the Third Parties without users' knowledge or authorization.

4. The Third Party Trackers also set a cookie that includes a unique user identifier, which the Trackers collect on subsequent visits and which is used by the Third Parties to identify and deanonymize the user.

5. The Trackers also intercept the contents of users' communications with the Website, including data that reveals users' specific activities on the Website, revealing the users' preferences. When users communicate with the Website by viewing event listings, clicking on tickets, searching for events, browsing content, or completing purchase and conversion events, the Trackers intercept data containing the content and meaning of these user interactions. This includes full string page URLs visited, event pages accessed, ticket searches, event category browsing, ticket purchase activity, conversion events, and user interactions with the Website. Thus, through the Trackers, SeatGeek collects and processes users' personal information and online activity, all of which is transmitted to the Third Parties in real time.

6. Defendant and these Third Parties use the data collected by the Trackers to identify and de-anonymize users and gather information concerning user preferences and inputs, enabling Defendant and Third Parties to create detailed user profiles on the user's likes and interests and hyper-target advertisements to users, and to enrich themselves.

7. The Trackers constitute "pen registers" under § 638.50(b) of the California Invasion of Privacy Act ("CIPA") because they capture users' "routisng, addressing, or signaling information." By installing and using these Trackers without first obtaining users' consent or a court order, SeatGeek violates CIPA § 638.51(a).

8. Consumers like Plaintiff and members of the Class (defined below) never gave SeatGeek their consent to collect any of their browsing activities, let alone allow Third Parties to create a digital dossier of their likes and interests.

9. SeatGeek's conduct violates the California Invasion of Privacy Act ("CIPA") § 631 by covertly intercepting users' online communications and exploiting that data for its own profit.

10. SeatGeek's conduct represents a serious invasion of privacy that the California Legislature expressly sought to prevent through CIPA. The Legislature recognized that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications" and that such invasion of privacy "cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

11. Through this action, Plaintiff seeks to halt SeatGeek's unlawful tracking practices and obtain appropriate remedies, including statutory damages of $5,000 per violation under CIPA § 637.2, for SeatGeek's knowing violations of California privacy law.

**PARTIES**

12. Plaintiff Jose Torres is a citizen of the State of California over the age of 18, and lives in Chula Vista, California with an intent to remain there. Plaintiff is therefore a resident of California. Plaintiff was in California when he visited the Website.

13. Defendant SeatGeek, Inc. ("Defendant" or "SeatGeek") is a Delaware corporation that owns, operates, and/or controls the Website, an online platform that sells event tickets, including to events in California, to users nationwide, including California users.

14. SeatGeek, along with its affiliates and agents, are collectively referred to as "Defendants." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 25, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

15. Plaintiff is informed and believes that at all relevant times, every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants, and that each of the acts and/or omissions complained of herein was ratified by each of the other Defendants.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are well over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States (California) and at least one defendant is the citizen of a different State or subject of a foreign state (Delaware).

17. This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Northern District of California by regularly engaging with individuals in California through its interactive website. Defendant maintains a regular web page to sell event tickets to San Francisco residents and other persons who would like to attend events in San Francisco, as well as one for Los Angeles residents and other persons who would like to attend events in Los Angeles, and another for San Diego residents and other persons who would like to attend events in San Diego. As of July 1, 2025, SeatGeek's Los Angeles concert page (https://SeatGeek.com/cities/la) advertised 2895 concerts, sporting events and shows in Los Angeles. As of July 1, 2025, SeatGeek's San Francisco concert page ((https://SeatGeek.com/cities/sf) advertised 2001 concerts, sporting events and shows in San Francisco. As of July 1, 2025, SeatGeek's San Diego concert page (https://SeatGeek.com/cities/san-diego) advertised 826 concerts, sporting events and shows in San Diego.

18. Further, on information and belief, in approximately 2013 SeatGeek acquired Palo Alto-based Fansnap, an online aggregator of ticket information and incorporated its capabilities into the current SeatGeek operation.

19. For these and other reasons, Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, including with TikTok, Meta and other California entities, Plaintiff would not have suffered harm.

20. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and, as noted above, has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to personal jurisdiction in this District because it has purposefully availed itself of the laws and markets within this District and has purposefully directed its activities toward this District.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

### A. The California Invasion of Privacy Act

21. The California Legislature enacted CIPA to address "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon

private communications" and declared that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

22. As the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

(*Ribas v. Clark* (1985) 38 Cal. 3d 355, 360-61 [emphasis added; internal citations omitted].)

23. As relevant in this case, CIPA § 638.51(a) prohibits any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

24. A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

25. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

26. More simply, according to these definitions, a "pen register" records outgoing information, while a "trap and trace device" records incoming information. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line.

With the advancement of modern communications technology and the internet, however, California courts have expanded the application of the laws relating to these surveillance devices.

27. For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

28. Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." (*In re Google Inc.* (N.D. Cal. Sep. 26, 2013) 2013 WL 5423918, at *21 [citing *Davis v. Pacific Telephone & Telegraph Co.* (Cal. 1899) 127 Cal. 312].)

29. Thus, courts—including this one—have found that internet tracking technology similar to those here fall under the purview of CIPA § 638.51. (See, e.g., *Shah v. Fandom, Inc*, (N.D. Cal. 2024) 754 F.Supp.3d 924, 930 [finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"]; *Mirmalek v. Los Angeles Times Communications LLC* (N.D. Cal. Dec. 12, 2024) 2024 WL 5102709, at *3-4 [same]; *Lesh v. Cable News Network, Inc.* (S.D.N.Y. 2025) 767 F.Supp.3d 33, 40-42 [same]; *Moody v. C2 Educ. Sys. Inc.* (C.D. Cal. 2024) 742 F.Supp.3d 1072, 1077 ["Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."]; *Greenley v. Kochava, Inc.* (S.D. Cal. 2023) 684 F.Supp.3d 1024, 1050 [referencing CIPA's "expansive language" when finding software was a "pen register"]; *Javier v. Assurance IQ, LLC* (9th Cir. May 31, 2022) 2022 WL 1744107, at *1 ["Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."].)

30. This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." (*Matera v. Google Inc.* (N.D. Cal. Aug. 12, 2016) 2016 WL 8200619, at *19.)

31. Here, Plaintiff also alleges that SeatGeek violates CIPA § 631 by covertly intercepting users' online communications without notice to the user. As detailed below, SeatGeek uses the Trackers to intercept information from its Website and allows Third Parties to read and use information without obtaining users' consent.

32. Individuals may bring an action against the violator of any provision of CIPA, including CIPA § 638.51—for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

**B. The Mechanics and Privacy Implications of IP Addresses**

33. An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

34. Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

*(1) Differentiating Between Public Versus Private IP Addresses*

35. A public IP address is accessible from anywhere on the internet; it is assigned by an Internet Service Provider ("ISP") and it is unique globally. Public IP addresses are required for devices that need direct internet access.

36. While public IP addresses are unique, they are not necessarily "public" in the sense that they are freely accessible. If an individual is not actively sending data packets out, the public IP address remains private and is not broadcast to the wider internet.

---

[1] See, e.g., *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

37. Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

38. A private IP address is used within an internal network and is not routable on the public internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). Thus, private IP addresses can be used repeatedly across different networks because they are isolated from the global internet. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

39. The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

40. An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). The public IP address determines the phone number who is making the call, which provides the most identifying information. On the other hand, knowing whether Handset #1 versus Handset #2 is making a call allows one to distinguish between members of the same household, although less can be gleaned from this fact on its own.

41. The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. On the other hand, while private IP addresses are not collected here,

they would effectively distinguish whether a user is using their laptop or smartphone to access a website by itself.[2]

42. Thus, the differences between public and private IP addresses are as follows:[3]

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br>10.0.0.0 – 10.255.255.255,<br>172.16.0.0 – 172.31.255.255,<br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

43. A public IP address is therefore "routing, addressing, or signaling information."

44. A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

45. A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

---

[2] That being said, here the Trackers also collect Device Metadata that distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows Third Parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the Device Metadata).

[3] *What's The Difference Between A Public And Private IP Address?* AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.




*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

*(2) The Privacy Implications of Public IP Addresses*

46. Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[5]

47. A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

48. In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to

[5] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData (Nov. 20, 2023), https://web.archive.org/web/20231209011353/https://www.accudata.com/blog/ip-targeting/.

[6] *Location-Based Targeting That Puts You in Control*, Choozle, https://choozle.com/geotargeting-strategies/.

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData (Nov. 20, 2023), https://web.archive.org/web/20231209011353/https://www.accudata.com/blog/ip-targeting/.

[9] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, Ad Tech Explained (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

their needs."[10] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

49. "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

50. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

51. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

52. In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

53. The collection of IP addresses here is particularly invasive when data brokers gain access. As a report from NATO found:

---

[10] See, e.g., *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://web.archive.org/web/20231207061951/https://deepsync.com/geomarketing/.

[11] See, e.g., *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[13] *Id.*

[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/42npz7nx.

[15] *Id.*

[16] *Id.*

[17] *Id.*

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

54. Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[19] For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[20]

55. Likewise, under the California Consumer Privacy Act, IP addresses are considered "personal information" because they are "reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." (Cal. Civ. Code § 1798.140(v)(1)(A).[21])

**C. Websites and Tracking Technologies**

56. When a user visits a website, their web browser must communicate with the website's server to load the page content. This communication happens through an "HTTP request" or "GET" request sent from the user's browser to the website's server. The server then responds with an "HTTP response" containing instructions for displaying the webpage, including what text should appear and

[18] Henrik Twetman & Gundars Bergmanis-Korats, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[19] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[20] *Is An IP Address Personal Data?* CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/ (last accessed Feb. 18, 2025); *see also What Is Personal Data?*, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[21] A "consumer" is defined as "a natural person who is a California resident." Cal. Civ. Code § 1798.140(i).) A "household" is defined as "a group … of consumers who cohabitate with one another at the same residential address and share use of common devices or services." Cal. Civ. Code § 1798.140(1).)

where, what images should load, and what music should play. A general diagram of the process is shown below, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.




57. During this process, the server's HTTP response process may also cause third-party trackers to be installed on a user's browser. The trackers are invisible pieces of code that can cause the browser to send information to a third party, including (as relevant here) the user's public IP address, full string URLs of pages visited including button clicks, and details about the user's device (make, model, operating system), browser information, and other persistent identifiers.

58. If the same third-party tracker is present across multiple websites, it can build a comprehensive profile of users by combining data from different sources. This enables sophisticated tracking of individuals' specific browsing habits, preferences, and behaviors across the internet.

59. Part of the way that Trackers typically operate includes the installation of cookies on users' browsers. A cookie is a small text file containing data that a website's server creates and transmits to a web browser, which then stores the file on the user's device. When a user revisits a website, the tracker can access the information stored in the cookie, allowing it to recognize the user, thereby helping the tracker to continue building their profile. These cookies can persist from a few days to several years, enabling long-term tracking and profiling.

60. When the same third-party tracker appears across multiple websites (such as the TikTok Pixel appearing on many websites beyond just SeatGeek), it can use its cookies to build a comprehensive profile of users by combining data from different sources. This enables sophisticated tracking of individuals' browsing habits, preferences, and behaviors across the internet.

61. The installation and operation of trackers and their related cookies occurs automatically and invisibly when users visit websites. Users are typically unaware that their data is being collected and transmitted to third parties or that information is being stored on their device through cookies, as the processes happen in the background without any visible indication.

**D. SeatGeek Installs Pen Registers on Users' Browsers That Defendant And The Third Parties Use To De-Anonymize And Identify Users, Surreptitiously Collect Information Concerning Their Website Activities And Sell Their Information To Advertisers**

62. When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[22]

63. Often times, third-party scripts are installed on websites "for advertising purposes."[23]

64. Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[24]

65. SeatGeek, Inc. is the proprietor of https://SeatGeek.com, an online platform that sells event tickets. Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's and other users' browsers. These Trackers are automatically installed on users' browsers without notice or consent whenever they visit the Website.

66. SeatGeek uses the Trackers to collect the website users' IP addresses, URLs of pages visited, and Device Metadata, and surreptitiously shares this information with TikTok, Meta and Microsoft without prior consent or a court order. The collected information includes full string page URLs visited, event pages accessed, ticket searches, event category browsing, ticket purchase activity, conversion events, and user interactions with the Website.

---

[22] See *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ (last accessed Jan. 7, 2026) ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[23] *Id.*

[24] *Id.*

67. As described below, when a user visits the Website, the Website's code—as programmed by Defendant—installs the Trackers onto the user's browser. This allows the Third Parties—through their respective Trackers—to collect Plaintiff's and Class Members' IP addresses, URLs of pages visited, browsing activity, and Device Metadata, and pervasively track them across the Internet.

68. At the forefront of SeatGeek's data collection practice is obtaining and transmitting consumer Website activities in real-time to the Third Parties. SeatGeek collects the pages the consumer requested, details about the events the consumer is viewing—including the event name, description and price, the buttons the consumer clicks, and text he or she enters into web forms and fields. Through the installation of the Trackers on its Website, SeatGeek redirects the information about the user to Third Parties for attribution and audience targeting.

69. Indeed, SeatGeek installed the Trackers intentionally to intercept the content of electronic communications between the consumer and the Website. Consumers entering text into a field or pressing a button intend to send messages to, or otherwise communicate with, the Website (and only that website). Similarly, the Website rendering search results, an event detail or other webpage also communicates with the consumer in response to his or her request. The Trackers collect, in real-time, the messages and/or communications intended for the Website only, such as search queries the consumer enters and sends to the Website, as well as the content of forms they fill out.

70. When users interact with websites—by clicking buttons, submitting forms, navigating between pages, or entering information—they communicate or intend to communicate directly with the website. As such, these actions constitute electronic communications between the user's browser and the website's server, transmitted over the internet in real time.

71. The Trackers SeatGeek installed on its Website operate by embedding tracking code directly within the source code of the Website. When a user navigates to a webpage with the Trackers installed, this embedded code executes in the user's browser and monitors all interactions between the user and the website as they happen. This interception occurs because the Trackers' code "listens" to user interactions and automatically sends HTTP requests to Third Parties' servers simultaneously with the requests sent to the SeatGeek's website's own servers. This includes information such as the user's IP address, the exact webpage URL visited, button clicks, page views, and any data entered into form fields

(including email addresses). The Trackers' code ensures that this data is captured and transmitted to Third Parties at the same time as the user is actively interacting with the webpage. This collection occurs in real time, while the user's requests and responses travel across the internet between the user's device and the website's servers.

72. Along with Website interactions, the Trackers cause additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

73. Defendant and the Third Parties then use the public IP addresses, Device Metadata, and browsing activities, and other information of the Website's visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information.

74. At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

75. These Trackers function as "pen registers" under CIPA because they capture and record users' public IP addresses and other routing, addressing, and signaling information, transmitting this data to the companies who own the Trackers, respectively TikTok, Meta and Microsoft. The specific operation of each Tracker is detailed below.

*The TikTok Tracker – a Pen Register*

76. SeatGeek shares information with TikTok. The TikTok Pixel is a code snippet that website owners can implement on their websites to share user information with TikTok. TikTok offers this

tracking technology to website owners like SeatGeek, who then embed it into their websites' code to enable sophisticated user tracking and targeted advertising.

77. Defendant installed the TikTok Pixel throughout its Website.

78. When a user first visits any page of the SeatGeek Website except the home page, their browser sends an HTTP request to SeatGeek's server, and SeatGeek's server sends an HTTP response with directions to install the TikTok Pixel on the user's browser. The TikTok Pixel, in turn, instructs the user's browser to automatically collect and transmit various information to TikTok. According to TikTok's own documentation, shown in the image below, this information includes: (1) The user's public IP address; (2) User interaction data, known as "events" - specific actions users take on the Website such as clicks on advertisements; (3) Timestamp data showing when the user took an action such as accessing the Website; (4) "User Agent" details about the user's device (make, model, operating system) and the browser the user is accessing the Website with; (5) URLs of pages visited; and (6) Cookies.[25]

[25] https://ads.tiktok.com/help/article/tiktok-pixel (last accessed Jan. 7, 2026).

## Key terms

The pixel collects information available via standard web browsers, like Chrome. This includes:

- **Ad/Event information:** Information about the ad a person on TikTok has clicked on or an event that was initiated.
- **Timestamp:** Used to determine when website actions took place, like when a page was viewed or when a product was purchased.
- **IP Address:** Used to determine the geographic location of an event.
- **User Agent:** Used to determine the device make, model, operating system, and browser information.
- **Cookies:** Used to help with the measurement, optimization, and targeting of your campaigns. First-party cookies are optional, but third-party cookies are on by default with the TikTok Pixel. Performance is boosted when first- and third-party cookies are paired with Advanced matching. Learn more about using cookies with TikTok Pixel to learn more.
- **Metadata & Button Clicks:** Includes descriptive page metadata, structured microdata, page performance data, and button clicks. In the future, this information will enable TikTok to provide recommendations on how to enhance our pixel event setup and offer automated solutions. This information can also be used to personalize ad campaigns for people on TikTok and improve TikTok's ad delivery systems. Learn more about how to enhance data postback with TikTok Pixel.

79. The TikTok Pixel collects information like this automatically on everyone who visits the Website, including Plaintiff, regardless of whether the Website user has a TikTok account. Collecting this information is the sole purpose of the TikTok Software.

80. Defendant installed the TikTok Software on its Website software in order to identify website visitors who would otherwise be anonymous. Plaintiff visited Defendant's Website after the TikTok Software was installed.

81. The TikTok Software acts via a deanonymization process known as "fingerprinting." Put simply, the TikTok Software collects as much data as it can about an otherwise anonymous visitor to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of individuals in California, the rest of the United States and abroad. This allows TikTok to associate the information it obtained through the Pixel with personally identifying information.

82. The TikTok Software begins to collect information the moment a user lands on the Website, regardless of whether the user eventually encounters and/or interacts with the Website's Privacy Notice. TikTok's "AutoAdvanced Matching" technology scans every website for information, such as name, date of birth, and address. This information is sent simultaneously to TikTok, so that TikTok can isolate with certainty the individual to be targeted.

83. As explained on TikTok's "Business Help Center"[26]:

The pixel collects information available via standard web browsers, like Chrome. This includes:

- **Ad/Event information:** Information about the ad a person on TikTok has clicked on or an event that was initiated.
- **Timestamp:** Used to determine when website actions took place, like when a page was viewed or when a product was purchased.
- **IP Address:** Used to determine the geographic location of an event.
- **User Agent:** Used to determine the device make, model, operating system, and browser information.
- **Cookies:** Used to help with the measurement, optimization, and targeting of user campaigns. First-party cookies are optional, but third-party cookies are on by default

[26] https://ads.tiktok.com/help/article/tiktok-pixel (last accessed Jan. 7, 2026).

with the TikTok Pixel. Performance is boosted when first- and third-party cookies are paired with Advanced matching.

- **Metadata & Button Clicks:** Includes descriptive page metadata, structured microdata, page performance data, and button clicks. Tiktok uses this information to provide recommendations to businesses using the TikTok Pixel on how to enhance their pixel event setup and also to offer automated solutions. This information can also be used to personalize ad campaigns for TikTok users and improve TikTok's ad delivery systems.

84. In addition, in order to accurately associate events collected by the pixel to a specific user, TikTok offers the "Automatic Advanced Matching" feature. This feature works by automatically collecting form data, such as email addresses, phone numbers, and other identifiers in hashed form. This data is then used to enhance the accuracy of matching users to their TikTok profiles, improving the targeting of ads. **When a website asks the user to submit information such as an email or phone number, this data is simultaneously sent to TikTok. This allows TikTok to accurately identify the individual.** The "Automatic Advanced Matching" feature is not enabled by default, and website owners are encouraged to activate it and agree to share their users' phone numbers and email addresses.

85. Auto Advanced Matching was turned on for pages on the Website during the time period pertinent to this matter.

86. Defendant has installed the TikTok Pixel on its website to enhance its marketing and advertising capabilities. By collecting Website users' public IP addresses and tracking them, Defendant can deanonymize and target these users with advertisements when they browse TikTok. The TikTok Pixel enables Defendant to identify which geographic locations its Website users come from and use this information to optimize its advertising campaigns; for example, by directing TikTok advertisements to users from specific regions who have previously visited the Website. By doing so, Defendant benefits from TikTok's powerful ad targeting and optimization tools. Through this unauthorized disclosure of user data, Defendant has prioritized its commercial interests at the expense of users' privacy rights.

87. The TikTok Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." (*Greenley*, *supra*, 684 F.Supp.3d at 1050.)

88. Further, the TikTok Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." (*James, supra*, 701 F.Supp.3d at 958.)

89. Because the TikTok Tracker captures the outgoing information—the IP address, URLs of pages visited, Device Metadata, and unique user IDs—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b).

90. The TikTok Tracker is also a "pen register" because the information it records is being used to ascertain the identity of visitors to Defendant's Website, and is thus recording "addressing" information. (*Greenley, supra*, 684 F.Supp.3d at 1050 ["software that identifies consumers" is a pen register].)

*The Meta (Facebook) Pixel – a Pen Register*

91. SeatGeek also employs the Meta Pixel, formerly known as the Facebook pixel, a snippet of JavaScript code that loads a small library of functions SeatGeek can use to track Facebook ad-driven visitor activity on the Website. It relies on Facebook cookies, which enable Facebook to "match" SeatGeek's website visitors to their respective Facebook user accounts.

92. SeatGeek shares each user's Facebook ID ("FID") and IP address, as well as browsing habits and interactions and URLs of pages visited with Facebook. An FID **uniquely identifies** an individual's Facebook user account. **Anyone who possesses an FID can use this identifier to quickly and easily locate, access, and view, the corresponding Facebook profile.** Simply put, anyone who knows how to use Facebook can use the information that the company is disclosing and identify any Facebook user. In addition, the Meta Pixel allows SeatGeek to track the number of times users "convert," i.e., take actions SeatGeek considers valuable, allowing SeatGeek to measure advertising effectiveness.

93. Once users are "matched" by Pixel functions, Meta can tally their actions on the Website in the Facebook Ads Manager, allowing SeatGeek to use the data to analyze the Website's conversion flows and optimize its ad campaigns. By default, the Meta Pixel tracks URLs visited, domains visited, the devices the Website's visitors use, and browser data such as the IP address, browser information, page location, document, FID, Pixel ID, Facebook Cookie, buttons clicked, pages visited, and optional custom data. It also allows SeatGeek to define custom audiences, allows the targeting of visitors most

likely to "convert," and sets up "Advantage+ catalog advertising campaigns," allowing SeatGeek to display to website users its most relevant offerings based on their interests, intent and actions.

94. Using this tool, SeatGeek shares its users' online activity with Meta, including their FIDs, User Agent, IP addresses, and other metadata, despite users having not consented to the sharing of this information.

95. Defendant installed the Meta Pixel on its Website in order to identify website visitors who would otherwise be anonymous. Plaintiff visited Defendant's website after the Meta Pixel was installed.

96. The Meta Pixel Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." (*Greenley*, *supra*, 684 F.Supp.3d at 1050.)

97. Further, the Meta Pixel Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." (*James, supra*, 701 F.Supp.3d at 958.)

98. Because the Meta Pixel Tracker captures the outgoing information—the IP address, Device Metadata, and unique user IDs—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b).

99. The Meta Pixel Tracker is also a "pen register" because the information it records is being used to ascertain the identity of visitors to Defendant's Website, and is thus recording "addressing" information. (*Greenley, supra*, 684 F.Supp.3d at 1050 ["software that identifies consumers" is a pen register].)

*The Bing Tracker – a Pen Register*

100. Microsoft owns and operates the Bing Tracker (also known as the Microsoft Advertising Universal Event Tracking or "UET" tag). Microsoft offers this tracking technology to website owners like SeatGeek, who then embed it into their websites' code to enable user tracking and targeted advertising.

101. Defendant installed the Bing Tracker throughout its Website.

102. When a user first visits the SeatGeek Website, their browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Bing Tracker on the user's browser. The Bing Tracker, in turn, instructs the user's browser to automatically

transmit to Microsoft various information including: (1) The user's public IP address; (2) Timestamp data showing when the user accessed the Website; (3) "User Agent" details about the user's device (make, model, operating system) and the browser the user is accessing the Website with; (4) URLs of pages visited; and (5) Cookies.[27]

103. One of the cookies that the Bing Tracker installs on the user's browser is known as the Microsoft User ID ("MUID"). The MUID contains a string of numbers and letters which is unique to each user's browser. This functions like a digital fingerprint, similar to how a social security number is unique to each person. While a user's public IP address may change between Website visits (for instance, when accessing the Website from different locations), the identifier associated with the MUID cookie remains constant for approximately 13 months, unless a user manually "clears" their cookies (upon which the Bing Tracker will automatically generate a new, unique identifier associated with the MUID cookie).

104. The persistent nature of the MUID cookie allows Microsoft to maintain continuous tracking of users across multiple browsing sessions by linking new IP addresses to the unique identifier associated with the MUID cookie.

105. Through these mechanisms, Microsoft can create a comprehensive record of a browser's Website activities over time, including the various IP addresses and locations from which the Website was accessed. The MUID constitutes personally identifiable information because it uniquely identifies a specific browser and enables Microsoft to track that browser's activities across multiple sessions and locations.

106. Defendant installed the Bing Tracker on its Website to enhance its marketing and advertising capabilities. By collecting Website users' public IP addresses and tracking them through the unique MUID identifier cookie, Defendant can target these users with advertisements when they use Microsoft-affiliated platforms, including Bing, Edge, and Outlook. The Bing Tracker enables Defendant to identify which geographic locations its Website users come from and use this information to optimize its advertising campaigns; for example, by directing Microsoft Ads to users from specific regions who have previously visited the Website. By doing so, Defendant benefits from Microsoft's ad targeting and

[27] https://help.ads.microsoft.com/apex/index/3/en/53056/ (last accessed Jan. 7, 2026).

optimization tools. Through this unauthorized disclosure of user data, Defendant prioritized its commercial interests at the expense of users' privacy rights.

107. The Bing Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." (*Greenley*, *supra*, 684 F.Supp.3d at 1050.)

108. Further, the Bing Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." (*James, supra*, 701 F.Supp.3d at 958.)

109. Because the Bing Tracker captures the outgoing information—the IP address, Device Metadata, and unique user IDs—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b).

110. The Bing Tracker is also a "pen register" because the information it records is being used to ascertain the identity of visitors to Defendant's Website, and is thus recording "addressing" information. (*Greenley, supra*, 684 F.Supp.3d at 1050 ["software that identifies consumers" is a pen register].)

**E. Plaintiff and Class Members Did Not Consent To Defendant's Disclosures, and They Have a Reasonable Expectation of Privacy in Their User Data.**

111. SeatGeek's Website operates a major e-commerce platform. Whenever users visit the website, the Trackers collect their IP addresses, along with additional information, as alleged herein.

112. The collection of Plaintiff's and Class Members' browsing data and personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

113. As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' Device Metadata and personal information.

114. At no time when users visit the Website does Defendant request or obtain consent from users before installing the Trackers on their browsers, as other responsible website owners regularly do. SeatGeek's Website Users are not presented with any pop-up window, banner, or other notification informing them that Defendant will be installing the Trackers or collecting their IP addresses and other

personally identifying information. The Trackers are incorporated seamlessly—and, to users, invisibly—in the background on the Website. That seamless and invisible incorporation gave and gives users no way of knowing that Defendant was collecting and surreptitiously sharing their public IP addresses and other data with these third parties.

115. Further, although the Website does have a Privacy Notice containing some disclosures about how information is shared, that policy can be viewed only after scrolling through all the website content to the very bottom of the webpage, long after the Trackers have been installed on users' browsers.

116. Thus, the IP address is sent as soon as the user enters the Website and a user need not click or scroll through the Website. Accordingly, even if the user was presented with a policy or consent form as they browsed the sites, the IP address was already sent without giving notice to the user or requesting any consent.

117. Further, the Privacy Notice and SeatGeek's Terms of Use take the form of a browsewrap agreement, in which users are not required to manifest expressed assent. The policies are also presented via hyperlinks the hyperlinks written in small, inconspicuous font and is listed among numerous other links at the bottom of the page.

118. Upon information and belief, Defendant was not authorized by any court order to use a pen register or trap and trace device to collect or disclose users' public IP addresses and other routing data.

119. The Trackers that Defendant implements on the Website are not necessary for the Website's functionality or operations. Users can access all core features of the SeatGeek Website without having their IP addresses and other data collected and shared with TikTok, Meta or others. These third-party Trackers serve solely to enable advertising and marketing that benefit Defendant's commercial interests at the expense of users' privacy rights.

120. Users reasonably expect that their public IP addresses and location data will remain private unless specifically shared with a website for the limited purpose of displaying relevant content. When visiting the Website, users do not expect their precise location data and browsing patterns to be secretly collected and disclosed to third parties for advertising purposes. This expectation of privacy is particularly reasonable given that public IP addresses can reveal detailed information about a user's physical

movements, daily routines, and personal activities - especially when collected repeatedly over time and combined with other tracking data, as they are by Defendant's Trackers. The California Legislature recognized this expectation of privacy through CIPA's protections against the unauthorized collection of "routing, addressing, or signaling information," acknowledging that advances in technology have created new ways to track individuals through their communications data.

## PLAINTIFF'S PERSONAL ALLEGATIONS

121. Plaintiff Torres regularly visited the SeatGeek Website on his desktop and mobile browsers throughout the entirety of the class period in or near his home in California.

122. When Plaintiff Torres visited the SeatGeek Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff Torres's browser.

123. During Plaintiff Torres's visits to the Website, Plaintiff searched for and browsed various events, specifically NFL and MLB sporting events. Plaintiff Torres searched for San Diego Padres tickets on multiple occasions. In doing so, Plaintiff necessarily disclosed to the Website information reflecting his personal interests in specific sporting events in which Plaintiff had a reasonable expectation of privacy. Plaintiff did not expect, and had no reason to expect, that his event searches would be intercepted by third-party Trackers and transmitted to TikTok, Meta, Microsoft, or any other entity without his knowledge or consent.

124. Through their respective Trackers, the Third Parties collected information concerning the exact webpages Plaintiff Torres visited, along with Plaintiff Torres's IP address and other device fingerprint information that allowed the Third Parties to pervasively track Plaintiff Torres across multiple Website sessions and even other websites, as well as de-anonymize Plaintiff Torres by synchronizing his user profiles amongst each other and with other entities.

125. Defendant and the Third Parties used the information collected by the Trackers to:

(i) identity Plaintiff Torres and either create a new profile of him or match Plaintiff Torres to a pre-existing profile (either in the Third Parties' own databases or with another entity's profile);

(ii) sell Plaintiff Torres's information to advertisers for hyper-targeted advertising based on the information collected by the Third Parties on the Website and the information

contained on any profiles of Plaintiff Torres (which are linked to Plaintiff Torres via the information collected by the Third Parties on the Website);

(iii) actually target Plaintiff Torres with advertisements and serve advertisements on Plaintiff Torres based on the information collected by the Third Parties on the Website and the information contained on any profiles of Plaintiff Torres (which are linked to Plaintiff Torres via the information collected by the Third Parties on the Website)

(iv) de-anonymize Plaintiff Torres and generate revenue from the sale of Plaintiff Torres's information—both what is collected on the Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

126. Plaintiff Torres also has accounts with Tiktok and Meta (Facebook and Instagram) and accessed those accounts on the same mobile browser he typically uses to visit the Website. After accessing Defendant's Website, Plaintiff received targeted advertising on his social media and specifically recalls seeing such advertising on Instagram relating to NFL searches he performed on the Website.

127. Plaintiff Torres did not provide his prior consent to Defendant to install or use the Trackers on his browser. Nor did Defendant obtain a court order before installing or using the Trackers.

128. Thus, Plaintiff Torres has had his privacy invaded by Defendant's violations of CIPA, and Defendant has likewise been unjustly enriched through the Third Parties' surreptitious and unconsented-to collection of Plaintiff Torres's data.

129. Accordingly, Plaintiff Torres has been injured by Defendant's violation of CIPA.

130. At no time when Plaintiff entered the SeatGeek Website and viewed its content did he authorize Defendant or consent to Defendant installing third-party Trackers on his internet browser, laptop or smartphone. Nor did he consent to Defendant collecting and disclosing his browsing data, IP addresses and other device fingerprint information to third parties. Further, because Defendant did not provide notice or request permission, Plaintiff was wholly unaware of and had no opportunity to opt out of Defendant's unauthorized disclosure of his data.

**CLASS ACTION ALLEGATIONS**

131. Plaintiff brings on behalf of himself and all others similarly situated as a class action on behalf of the following class (the "Class"):

> All California citizens who accessed the Website in California and had their IP address, Device Metadata, and/or unique user identifiers recorded or decoded by the Trackers and who did not register with SeatGeek and/or purchase tickets from SeatGeek (the "Class").

132. The following people are excluded from the Class: (i) any Judge presiding over this action and members of her or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

133. *Numerosity.* Members of the Class are so numerous that joinder of all class members is impractical. Given the popularity of the Website, the number of persons in the class is estimated to be in the thousands, if not millions. Additionally, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.

134. *Commonality and predominance.* A well-defined community of interest exists in the questions of law and fact involved in this case. Questions of law and fact common to the members of the class that predominate over questions affecting only individual Class members include:

(a) Whether Defendant installed the Trackers on the Website.

(b) Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(c) Whether the Trackers are "pen registers" in terms of Cal. Penal Code §638.50(b);

(d) Whether Defendant sought or obtained a court order for its use of the Trackers.

(e) Whether Defendant's conduct violates the California Invasion of Privacy Act, Cal. Penal Code § 630, *et seq*.

(f) Whether Plaintiff and Class Members are entitled to actual and/or statutory damages.

135. *Typicality.* Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, visited the Website and had his IP addresses and other identifying information collected by the Trackers which were installed and used by Defendant.

136. *Adequacy.* Plaintiff will adequately safeguard the interests of the Class members, as Plaintiff's interests align with, and do not contradict, those of the Class. Plaintiff's counsel has experience in handling class action litigation, including in the area of consumer digital privacy.

137. *Superiority.* A class action is the most effective, efficient and fair way to resolve this dispute, as individual litigation by all Class members is impractical and would overburden the court system. It would also risk inconsistent judgments and increase delays and expenses for all involved parties. In contrast, proceeding as a class action presents few management challenges, conserves resources, and protects the rights of each Class member. Plaintiff expects no difficulties in managing this case as a class action.

**<u>FIRST CAUSE OF ACTION</u>**

**Violation of the California Computer Data Access and Fraud Act**

**(California Penal Code § 502)**

Plaintiff incorporates the above paragraphs by reference and says—

138. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

139. The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

140. The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental

agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

141. For purposes of the statute, a number of definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

142. The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

143. The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

144. Plaintiff's and Class members' web browsers used to access the Website are "computer software," and the devices on which Plaintiff and Class members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

145. The statute also defines the term "data" to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

146. As discussed above, a website cookie, including a third-party tracker cookie, and an IP address both are "data" within the meaning of the statute.

147. Under California Penal Code § 502(c)(1), it is unlawful knowingly to access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

148. The statute also makes it unlawful to access knowingly and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

149. The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

150. Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system, or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

151. Based on Defendant's unauthorized installation and storage of third-party tracker cookies on Plaintiff's and Class members' web browsers, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiff's and Class members' data and computer systems in violation of Penal Code § 502(c)(1).

152. Similarly, the installation of those third-party tracker cookies violates subsection (c)(4) because Defendant added and altered data and computer software on Plaintiff's and Class members' computers or computer systems. Cal. Penal Code § 502(c)(4).

153. By installing third-party tracker cookies, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiff's and Class members' computers, computer systems, and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7).

154. Further, Defendant's unauthorized collection and disclosure to undisclosed third parties of Plaintiff's and Class members' personally identifying and addressing information violate Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses, from Plaintiff's and Class members' computers, computer systems, or computer networks.

155. Plaintiff and Class members are residents of California who used their computers, computer systems, and/or computer networks in California. Defendant accessed or caused to be accessed Plaintiff's and Class members' data and other personally identifying information from within California.

156. Defendant was unjustly enriched by accessing, acquiring, taking, and using Plaintiff's and Class members' data and computer systems without their permission or consent, and using all of that identifying information to maximize revenue from selling advertising space on the Website and for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

157. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class members have suffered damages. Under Penal Code § 502(e)(1), Plaintiffs and Class members are entitled to compensatory damages, injunctive relief, and other equitable relief in an amount to be determined at trial.

158. Plaintiff and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

## SECOND CAUSE OF ACTION

### Violation of the California Invasion of Privacy Act, Cal. Penal Code § 638.51(a)

Plaintiff incorporates the above paragraphs by reference and says—

159. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

160. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

161. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).)

162. The Trackers are "pen registers" because they are "device[s] or process[es]" that capture the "routing, addressing, or signaling information"—including the public IP addresses—from the electronic communications transmitted by Plaintiff's and Class Members' computers and browsers. Cal. Penal Code § 638.50(b).

163. At all relevant times, Defendant installed and used the Trackers—which are pen registers—on Plaintiffs' and Class Members' browsers, and used the Trackers to collect Plaintiff's and Class Members' IP addresses.

164. IP addresses constitute routing and addressing information and do not reveal the contents of the communications between users and the Website.

165. Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers on their browsers.

166. Defendant did not obtain a court order to install or use the Trackers.

167. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

**THIRD CAUSE OF ACTION**

**Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631(a)**

Plaintiff incorporates the above paragraphs by reference and further alleges—

150. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, et seq. ("CIPA"), to address "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Id. § 630. CIPA is intended "to protect the right of privacy of the people of this state." *Id.*

151. To establish liability under section 631(a), Plaintiff need only establish that Defendant, "by means of any machine, instrument, or contrivance, or in any other manner," did or does any of the following:

"[i] [I]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, Or

[ii] [W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state, Or

[iii] [U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, Or

[iv] [A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

152. Under § 631, a defendant must show that it had all parties' consent.

153. Defendant, TikTok, Meta, and Microsoft are each a "person" for the purposes of CIPA.

154. Defendant systematically and routinely does business in California with California residents. TikTok, Meta, and Microsoft each intercepted Plaintiff's and Class Members' data and confidential communications in California, where Plaintiff and Class Members are located. TikTok and Meta each maintain significant operations in California, where they designed, contrived, agreed to, conspired to achieve, effectuated, and/or received the interception and use of the contents of Plaintiff's and Class Members' private communications, including their browsing activity and searches for events on the Website.

155. The Trackers, Plaintiff's and Class Members' web browsers, and Plaintiff's and Class Members' computing and mobile devices are a "machine, instrument, or contrivance…or other manner."

156. When Plaintiff and Class Members communicate with the Website by viewing event listings, clicking on tickets, searching for events, browsing content, or completing purchase and conversion events, these interactions constitute communications containing content and meaning. This includes page URLs visited, event pages accessed, ticket searches, event category browsing, ticket purchase activity, conversion events, and user interactions with the Website, all of which are "contents" of communications under CIPA. Courts have consistently held that browsing activity and page URLs constitute "contents" under CIPA.

157. At all relevant times, Defendant installed and activated the Trackers, including the TikTok Pixel, the Bing Tracker, and the Facebook Pixel, on the Website. These Trackers intercepted

communications between Plaintiff (and Class Members) and the Website, without their consent, and while those communications were in transit.

158. TikTok, Meta, and Microsoft, by using JavaScript code embedded into the Website's source code by Defendant, were able to intercept, read, and analyze the contents of communications between users and the Website, including users' event searches, URLs of pages visited, IP addresses, and device information. The interception, reading, and analyzing of users' private information and communications occurred while the communications were in transit to the Website's servers. TikTok, Meta, and Microsoft intercepted, read, and analyzed users' communications and then selected which part of the communication data to use for their advertising and analytics purposes. Defendant permitted TikTok, Meta, and Microsoft to intercept, read, and analyze Plaintiff's and Class Members' interactions and private communications with the Website while those communications were in transit to Defendant's servers or were passing over any wire, line or cable, or were being received at any place within California.

159. TikTok, Meta, and Microsoft used, or at the very least had the capability to use, the private communications and information that they intercepted, read, and learned of through the Trackers for their own purposes, including to improve their own advertising and analytics services and to create new technologies and offerings.

160. At all relevant times, Defendant willingly facilitated, aided, employed, agreed with, and conspired with unauthorized third parties including TikTok, Meta, and Microsoft to track, intercept, read, analyze, and use Plaintiff's and Class Members' personal and private communications made via the Website. Those communications were intercepted, read, and analyzed by the Trackers while the communications were in transit to the Website and without Plaintiff's and Class Members' authorization or consent.

161. By allowing TikTok, Meta, and Microsoft, without consent or written authorization, to intercept, read, analyze, and obtain Plaintiff's and Class Members' personal and private communications, Defendant acted intentionally or, alternatively, with knowledge that TikTok's, Meta's, and Microsoft's unauthorized interception, receipt, reading, and use of Plaintiff's and Class Members' communications would be a violation of CIPA.

162. Defendant provided substantial assistance and encouragement to TikTok, Meta, and Microsoft, including but not limited to (1) installing and embedding the Trackers' JavaScript code on the Website without proper safeguards to preserve the confidentiality of users' communications, (2) failing to provide notice to Website users of its use of the tracking technology and of TikTok's, Meta's, and Microsoft's ability to intercept, read, and obtain users' personal communications, and (3) allowing TikTok, Meta, and Microsoft to have direct access to, intercept, read, analyze, and use Website users' private communications without those users' consent or authorization.

163. By so doing, Defendant provided the means to accomplish TikTok's, Meta's, and Microsoft's unauthorized interception, reading, analyzing, selecting, and use of Plaintiff's and Class Members' communications. Accordingly, the interception by TikTok, Meta, and Microsoft was unlawful, and Defendant aided and abetted their unlawful conduct.

164. Defendant's conduct as described above violated California Penal Code § 631(a). Under Penal Code § 637.2, Plaintiff and Class Members therefore are entitled to $5,000 in statutory damages per violation, even in the absence of proof of actual damages, the amount deemed proper by the California Legislature.

**FOURTH CAUSE OF ACTION**

**Invasion of Privacy**

**(Violation of Art. 1, § 1 of the California Constitution)**

Plaintiff incorporates the above paragraphs by reference and says—

168. "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

169. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy;

and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

170. Plaintiff and Class members have a legally protected privacy interest in their personally identifying and addressing information that is captured, without notice or consent, when they access and view the Website. These privacy interests are recognized by the California Constitution and CIPA.

171. Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, as they could not reasonably have expected that Defendant would violate state privacy laws. Plaintiff and Class members were not aware of and could not reasonably have expected that Defendant would use website tracking technology and install third-party tracker cookies without notice and/or without obtaining consent. Those unauthorized trackers collected and transmitted to undisclosed third parties Plaintiff's and Class members' personally identifying and addressing information, including their IP addresses, which contain geolocation data.

172. Defendant's unauthorized (1) installation of third-party tracker cookies and (2) collection and disclosure to undisclosed third parties of Plaintiff's and Class members' personally identifying and addressing information, all without consent or adequate notification to Plaintiff and Class members, are invasions of Plaintiff's and Class members' privacy.

173. Defendant's conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information disclosed by Defendant and shared with third-party trackers was personally identifying information protected by the California Constitution and numerous statutes; (ii) Defendant did not have authorization or consent to disclose that personally identifying and addressing information, including IP addresses, to any third-party tracker embedded in the Website, and the trackers did not have authorization to collect and use that geolocation information; and (iii) the invasion deprived Plaintiff and Class members of the ability to control the dissemination and circulation of that information, an ability that is a fundamental privacy right. Defendant's conduct constitutes a severe and egregious breach of social norms.

174. As a direct and proximate result of Defendant's actions, Plaintiff and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

175. Plaintiff and the Class members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned by Defendant because of, by way of or in connection with the intrusions upon Plaintiff's and Class members' privacy, nominal damages, and all other equitable relief that will compensate Plaintiff and Class members properly for the harm to their privacy interests.

176. Plaintiff also seeks such other relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**

**Common Law Invasion of Privacy – Intrusion Upon Seclusion**

Plaintiff incorporates the above paragraphs by reference and says—

177. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

178. Plaintiff and Class Members had a reasonable expectation of privacy in communications with Defendant via its Website. Plaintiff and Class members communicated personally identifying and addressing information that they intended for only Defendant to receive and that they understood Defendant would keep private.

179. Defendant's disclosure of that information to third parties without the knowledge and consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

180. Plaintiff and Class members had a reasonable expectation that such information would remain confidential and that Defendant would not utilize tracking technology on its Website to secretly transmit their personally identifying and addressing information to unauthorized third parties.

181. Defendant therefore obtained Plaintiff's and Class members' personally identifying and addressing information under false pretenses and/or exceeded its authority to obtain such information.

182. As a result of Defendant's actions, Plaintiff and Class members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

183. Plaintiff and Class members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

184. Plaintiff and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class members for the harm to their privacy interests because of Defendant's intrusions upon Plaintiff's and Class members' privacy.

185. Plaintiff and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

186. Plaintiff also seeks such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

187. Accordingly, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that this Court grant judgment against the Defendant as follows:

(a) An order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class.

(b) An order declaring that Defendant's conduct, as described above, violates California Penal Code §§ 502 and 638.51;

(c) An order finding in favor of Plaintiff and the Class on all counts;

(d) For statutory damages of $5,000 for each violation of CIPA § 638.51(a) and any other damages the Court deems fair and just, including punitive damages;

(e) For pre- and post-judgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief; and

(g) For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: June 29, 2026

Respectfully submitted,

*/s/Adam J. Zapala*

Adam J. Zapala (SBN 245748)
Kevin J. Boutin (SBN 334965)
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
kboutin@cpmlegal.com

Katrina Carroll (*pro hac vice*)
**CARROLL SHAMBERG LLC**
111 W. Washington Street
Suite 1240
Chicago, IL 60602
872-215-6205
katrina@csclassactions.com

***Attorneys for Plaintiff and the Putative Class***